**In re Stephen P. CERMINARO, Kathleen A. Cerminaro, Debtors.**

**In re Tina M. TINKER, Robert Tinker, Debtors.**

**Bankruptcy Nos. 97–62790, 97–62628.**

United States Bankruptcy Court,
N.D. New York.

April 20, 1998.

---

Cooper, Erving, Savage, Nolan & Heller, Craig H. Norman, of counsel, Albany, NY, Attorneys for Domestic Loan & Investment Bank, (Stephen P. and Kathleen A. Cerminaro case).

Jeffrey Dove, Menter, Rudin & Trivelpiece, P.C., Syracuse, NY, Attorneys for Green Tree Credit Corp., (Tina M. and Robert Tinker case).

Wayne Bodow, Syracuse, NY, for Debtors.

Mark W. Swimelar, Syracuse, NY, Chapter 13 Trustee.

### MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

Presently before the Court are two cases: *In re Stephen and Kathleen Cerminaro,* Case No. 97–62790, —— B.R. —— (Bkrtcy. N.D.N.Y.1998) (*"Cerminaro case"*), *In re Tina and Robert Tinker,* Case No. 97–62628, —— B.R. —— (Bkrtcy.N.D.N.Y.1998) (*"Tinker case"*) consolidated for the purposes of this decision since both cases involve the same legal issue: whether chapter 13 debtors can modify the rights of creditors whose claims are secured by mortgages against the Debtors' residences which mortgages are completely unsecured without violating § 1322(b)(2) of the Bankruptcy Code (11 U.S.C. §§ 101–1330) ("Code"). In the Cer-

minaro case an objection to confirmation was filed on June 19, 1997, by Domestic Loan and Investment Bank ("Domestic") on the ground that the proposed plan of Stephen and Kathleen Cerminaro (the "Cerminaros") treats its claim, secured by a mortgage against the Cerminaros' principal residence, as unsecured.[1] Similarly, in the Tina M. and Robert Tinker ("Tinkers") case, an objection to confirmation was filed by Green Tree Credit Corp. ("Green Tree") on July 3, 1997, on the ground that the proposed plan of Tinkers modifies its note and mortgage secured by the principal residence of the Tinkers in violation of Code § 1322(b)(2).

In the Cerminaros' case, the Court held an evidentiary hearing on September 11, 1997, in Utica, New York on the issue of the value of the Cerminaros' residence.[2] On September 25, 1997, Domestic requested a further hearing to submit additional proof of valuation and a hearing was scheduled for December 3, 1997.[3] The matter was submitted for decision on January 23, 1998.

In the Tinkers' case, an evidentiary hearing on the value of the residence of the Tinkers was originally scheduled to be heard on September 22, 1997, and was adjourned on the consent of the parties. The Court held an evidentiary hearing on October 27, 1997, in Utica, New York. The Court reserved decision and gave the parties the opportunity to file additional memoranda of law. The matter was submitted for decision on November 26, 1997.

### JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of these contested matters pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1) and (b)(2)(L).

---

1. Domestic also objected to confirmation on the basis that the attorneys' fees provided for in the proposed plan are unreasonable. The Court noted at the evidentiary hearing on September 11, 1997, that other issues relating to confirmation such as feasibility were not before the Court at that time and would be addressed at a later date. Therefore, the Court will address this objection to attorneys' fees at the confirmation hearing.

2. The Court gave the parties until September 26, 1997, to request an opportunity to submit additional proof.

3. The hearing was not held because the appraisals of the Cerminaros and Domestic both valued the property as of the date of the Petition at a figure less than the amount of the first mortgage on the residence. *See* Letter, dated December 2, 1997, from Craig H. Norman, Attorney for Domestic.

*FACTS*

1. *The Cerminaro case*

On May 6, 1997, the Cerminaros filed a voluntary petition ("Petition") seeking relief under chapter 13 of the Code. In their Petition, the Cerminaros listed their address as 8192 Gatewood Drive, Clay, New York ("Residence"). In Schedule A attached their Petition, they indicated that their Residence had a value of $75,000. The Cerminaros listed Chase Manhattan Mortgage Corp. ("Chase") as holding a first mortgage on their Residence securing an obligation in the amount of $73,687.48 and Domestic as holding a second mortgage on their Residence securing an obligation in the amount of $14,656. *See* Schedule D of Cerminaros' Schedules.[4] Domestic filed a proof of claim on June 2, 1997, in the amount of $15,076.07. The proposed plan of the Cerminaros filed with their Petition treated the claim of Domestic as unsecured.[5] Additionally, their proposed plan seeks to have Domestic "provide release of lien and satisfaction of second mortgage."

At the evidentiary hearing on September 11, 1997, both the Cerminaros and Domestic offered expert testimony regarding the value of the Cerminaros' Residence on June 15, 1995, the date when the second mortgage was executed.[6] The appraiser called as a witness for Domestic, John Mako, testified that the value of the Residence on June 15, 1995 was $76,000. The appraiser called as a witness for the Cerminaros, J. Robert Gerbin ("Gerbin"), valued the Residence at $70,000 both on the date the Domestic mortgage was executed as well as on August 22, 1997. It is

undisputed by the parties that the value of the Residence on the Petition date was less than the balance due on the first mortgage held by Chase.[7]

2. *The Tinker Case*

The Tinkers filed a voluntary petition ("Petition") on April 30, 1997, seeking relief under chapter 13 of the Code. In their Petition, the Tinkers listed their address as 66 North Street, McGraw, New York ("Residence"). In Schedule A attached to their Petition, the Tinkers indicated the value of their Residence as $28,000. The Tinkers listed Dale Mortgage Bankers Corp. ("Dale") as holding a first mortgage on their Residence securing an obligation with a zero balance as of the date of filing and Green Tree as holding a second mortgage on their Residence securing an obligation in the amount of $7,500 in Schedule D. Dale filed a proof of claim on August 13, 1997, listing $29,437.03 as a secured claim. Green Tree filed a proof of claim in the amount of $7,037.05 on July 2, 1997.[8] The proposed plan of the Tinkers, attached to their Petition, seeks to have Green Tree "provide satisfaction of mortgage and consent to treatment as unsecured."

At the evidentiary hearing, the Tinkers also offered the expert testimony of Gerbin who testified that the Residence of the Tinkers had a value of as $28,000 as of April 30, 1997, the date they filed their Petition. Additionally, Gerbin testified that the Residence of the Tinkers also had a value of be $28,000 as of September 15, 1995, when the mortgage by Green Tree was executed.[9] Gerbin prepared his appraisals using only the compara-

---

**4.** The Cerminaros indicated in Schedule D that "[t]here was no equity for this lien to attach at time mtg was made. Claim treated as unsecured."

**5.** Section G of the proposed plan provides that the liens of creditors treated as unsecured "shall survive unless avoided."

**6.** The parties stipulated that the balance on the first mortgage in June 1995 was $75,086.

**7.** Both the Cerminaros and Domestic obtained appraisals of the Residence indicating that the value of the first mortgage completely encumbered the Residence on the Petition date. *See* Letter, dated December 2, 1997, from Craig H. Norman, Attorney for Domestic to the Court.

**8.** While the Tinkers' Petition fixed Dale's obligation at zero, their plan acknowledged "arrears" on the Dale mortgage of $510 and the Tinkers did not challenge the proof of claim filed by Dale on August 13, 1997.

**9.** At the evidentiary hearing, Jeffrey Dove, the attorney for Green Tree argued that the value of the Residence at the time the mortgage was placed on the property was not relevant. The attorney for the Tinkers, Wayne Bodow, asserted that it was relevant for the purposes of preserving the record for appeal. The Court admitted the testimony pertaining to the value of the Residence on this date.

ble sales approach. The Court took judicial notice of the proof of claim filed by Dale which both parties agree was the amount due on Dale's mortgage on the date the Petition was filed. Green Tree did not offer any expert testimony as to the value of the Tinkers' Residence.

## ARGUMENTS

### 1. *Cerminaro Case*

Domestic contends that in light of Code § 1322(b)(2), it is not permissible for a debtor to treat a claim secured only by the principal residence of the debtor as unsecured in its plan, even if there is no equity in the debtor's residence over and above senior liens. Therefore, Domestic asserts that the Cerminaros cannot treat its mortgage lien on their Residence as an unsecured claim through a process referred to as "lien stripping." Domestic acknowledges that this Court previously held in the case of *Scheuer v. Marine Midland Bank (In re Scheuer)*, 213 B.R. 415, 417–18 (Bankr.N.D.N.Y.1997), that lien stripping is permitted where a debtor's residence had no value in excess of senior liens. Domestic contends that *Scheuer* was incorrectly decided. Additionally, Domestic makes the argument that the Supreme Court's decision in *Nobelman v. American Sav. Bank*, 508 U.S. 324, 332, 113 S.Ct. 2106, 2111, 124 L.Ed.2d 228 (1993), rejected any Code § 506(a) analysis in interpreting the term "secured" in Code § 1322(b)(2). Domestic contends that *Nobelman* is grounded upon the premise that the bank as a mortgagee has rights that cannot be modified by virtue of Code § 1322(b)(2).

Domestic argues that Congress intended that Code § 1322(b)(2) would facilitate the free flow of mortgage money into the residential mortgage market by protecting mortgage lenders, and *Nobelman* is consistent with this intent as it protects mortgage lenders. Domestic contends that following *Scheuer* in this matter would not be consistent with the purpose of Code § 1322(b)(2). Domestic asserts that the purpose of their loan was to allow the Cerminaros to improve their residence which is one of the traditional purposes of mortgage lending. Domestic points out that while the Cerminaros did use

the money to make improvements to their Residence nevertheless the value of their Residence declined. Domestic contends that lien stripping should not be permitted based upon these facts. Domestic points out that if *Scheuer* is followed, home improvement loans will become a more risky business as creditors will bear the risk of all decreases in the value of debtors' residences.

Finally, Domestic argues that if the Court follows *Scheuer* and permits lien stripping, then the value of the Cerminaros' Residence should be determined at the date their loan was executed, June 15, 1995, not the date they filed their Petition. Domestic contends that after *Nobelman*, lien stripping must be grounded on policy and the main policy reason to allow lien stripping is to deter mortgagees from using Code § 1322(b)(2) as a safe harbor for securing a debt which would otherwise be unsecured. Domestic makes the argument that courts finding that lien stripping is permissible notwithstanding Code § 1322(b)(2) seem to embrace the idea that creditors should be deterred from this practice. Therefore, Domestic argues that deterrence is only meaningful at the time the loan was made. Domestic points out that there was value, or the debtors had equity in the property at the time its loan with the Cerminaros was executed. Therefore, Domestic holds at least a partially secured claim and its rights should be protected from modification by Code § 1322(b)(2).

The Cerminaros argue that lien stripping in chapter 13 is permissible and the Court's decision in *Scheuer* governs the present matter before the Court. It is the position of the Cerminaros that a lender providing money to a borrower to improve its home is consistent with good public policy and Congressional intent. The Cerminaros allege, without any proof, that at the time Domestic gave them a loan, Domestic was well aware that the value of their Residence would not support the existing liens as well as its mortgage but it relied on the assumption that the improvements would increase the value of the home thereby supporting its junior lien. The Cerminaros assert that the value of the property did not increase as a result of the improvements. The Cerminaros contend that they

should not be penalized or prohibited for exercising their "constitutional right" to protection in bankruptcy or blamed for the fiscal irresponsibility of secondary lenders. The Cerminaros argue that the valuation date should be determined as of the date their Petition was filed pursuant to Code § 502(b).

### 2. Tinker Case

Green Tree contends that the Tinkers are prohibited from modifying its mortgage pursuant to Code § 1322(b)(2) regardless of whether the mortgage is partially secured or totally unsecured.[10] Green Tree argues that in *Nobelman,* the Supreme Court focused on the rights of mortgagees and not on their claims. It is the assertion of Green Tree that the legislative history of Code § 1322(b)(2) cited by Justice Stevens in *Nobelman* supports this position. Green Tree argues that it is unreasonable for the rights of secured creditors to depend upon real estate appraisals which provide only approximate values of the fair market value. If lien stripping is permitted, Green Tree argues that it should only occur after the Tinkers have completed all payments under their plan and obtained a discharge.[11]

### DISCUSSION

■ The main issue to be addressed is whether pursuant to Code § 1322(b)(2) a debtor can modify the rights of a creditor holding a claim secured only by a lien on a debtors' principal residence that constitutes a completely undersecured or unsecured claim. According to Code § 1322(b)(2), generally secured and unsecured claims can be modified through a chapter 13 plan; however, there is an exception for creditors holding claims secured only by a security interest in the principal residence of the debtors.[12] In

*Nobelman* the Supreme Court interpreted the exception to modification and held that the rights of a mortgagee holding a claim *partially secured* by the debtor's principal residence were protected from modification. 508 U.S. at 332, 113 S.Ct. at 2111. There is a continuing dispute among the courts as to whether a debtor can modify the rights of a mortgagee whose claim is *completely unsecured.* A majority of courts, including this Court in *Scheuer,* 213 B.R. at 417–18, have interpreted *Nobelman* as indicating that a mortgagee must first qualify under Code § 506(a) as a holder of a secured claim in order to obtain the protection of Code § 1322(b)(2). *See, e.g., In re Hornes,* 160 B.R. 709, 710 (Bankr.D.Conn.1993). The minority position is that the rights of all mortgagees are entitled to the protection of Code § 1322(b)(2), even if they hold completely unsecured claims. *See, e.g., In re Bauler,* 215 B.R. 628, 632 (Bankr.D.N.M.1997).

*Scheuer* was decided in the context of separate motions for summary judgment in an adversary proceeding commenced by a complaint filed by debtors that requested the Court to fix the claim of a second mortgagee at "0.00" and discharge its lien. 213 B.R. at 416. The second mortgagee filed a proof of claim listing a secured claim. *See id.* Although the proposed plan of the debtors did not specifically provide for the treatment of the second mortgagee's claim, it would be paid as an unsecured creditor. *See id.* at 416 & n. 2. The Court denied the parties' respective motions for summary judgment because it was necessary to determine whether the second mortgagee held a secured claim which involved a valuation of the residence of the debtors. *See id.* at 419. In *Scheuer* the Court based its conclusion that a creditor must hold a secured claim in order to obtain

---

10. Green Tree argues that its claim against the Tinkers is partially secured. *See* Green Tree's Objection to proposed Chapter 13 Plan and Confirmation Thereof ("Objection") filed on July 3, 1997, at 1. However, Green Tree did not offer any evidence at the evidentiary hearing that it was partially secured.

11. Green Tree's legal arguments were contained in its Objection. Neither party filed a post hearing memorandum of law though invited to do so by the Court.

12. (b) . . ., the plan may-

(2) modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence,* or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims;

11 U.S.C. § 1322(b)(2) (emphasis added).

the protection of Code § 1322(b)(2) on two grounds. The Court pointed out that *Nobelman* discussed the interrelationship of Code §§ 506(a) and 1322(b)(2) and, in fact, applied Code § 506(a) before determining that the bank's rights were protected from modification. *See id.* at 418. In *Scheuer*, the Court observed the determination of the Supreme Court that the mortgagee held a claim that contained secured[13] and unsecured components[14] according to Code § 506(a). 213 B.R. at 418. Additionally, the Court in *Scheuer* pointed out that the Supreme Court wanted to give "effect to § 506(a)'s valuation and bifurcation of secured claims through a Chapter 13 plan." *Id.* (citing *Nobelman*, 508 U.S. at 332, 113 S.Ct. at 2111). Therefore, the Court found that "only if it is determined that the creditor has a secured claim that the rights protected under Code § 1322(b)(2) then extend to any unsecured portion of its claim as well ." *Id.* at 419. The second basis for the Court's decision in *Scheuer* was that the Supreme Court's holding in *Nobelman* did not apply to a situation where the mortgagee holds a claim that is completely unsecured. The Court pointed out that *Nobelman* concerned a claim of a mortgagee that was secured in part which was a significant fact upon which the Supreme Court based its reasoning that mortgagees which are partially unsecured are entitled to the protection of Code § 1322(b)(2). *See id.* In *Scheuer*, the Court noted that the Supreme Court's discussion of the "rights" of a mortgagee,[15] which the minority of courts rely on for support, was in the context of a determination that the mortgagee held a claim that consisted of unsecured and secured components. 213 B.R. at 418. The Court observed a concern of the Supreme Court that the secured portion of mortgagee's claim would necessarily be effected by the modification of the unsecured portion. *See id.* (citing *Nobelman*, 508 U.S. at 331, 113 S.Ct. at 2111).

Therefore, this Court found that the same rationale that warranted the protection of the mortgagee who holds a partially secured claim does not apply to a mortgagee holding a claim that is totally unsecured. *See id.*

Subsequent to the Court's decision in *Scheuer*, courts addressing the issue continue to align with the majority position. *See, e.g., Lam v. Investors Thrift (In re Lam )*, 211 B.R. 36, 41 (9th Cir. BAP 1997); *In re Cervelli*, 213 B.R. 900, 909 (Bankr.D.N.J.1997). In *Lam*, the creditor's fourth deed of trust was wholly unsecured based upon the current fair market value of the residence of the debtors. 211 B.R. at 38. Policy reasons supported the position of the court in *Lam* that the protections of Code § 1322(b)(2) do not extend to the holders of totally unsecured claims. *Id.* at 41. The court in *Lam* observed that protecting holders of completely unsecured claims "might encourage junior mortgagees to intentionally obtain a mortgage on property that is already overburdened with senior mortgages for the sole purpose of avoiding modification of his or her pre-petition contractual rights." *Id.* Additionally, the court in *Lam* pointed out that "the congressional intent of encouraging home lending by residential mortgagees" mentioned by Justice Stevens in his concurring opinion in *Nobelman*, does not apply to second mortgagees because they "are not in the business of lending money for home purchases, [so] the same policy reasons for protection of first mortgagees under section 1322(b)(2) do not exist for second mortgagees." *Id.*

In a recent decision, Bankruptcy Judge Robert E. Littlefield, Jr. held that pursuant to Code § 1322(b)(2) a debtor cannot void a creditor's lien secured only by the principal residence of the debtor. *See Pond v. Farm Specialist Realty (In re Pond )*, Case No. 96–10015, Adv. No. 96–91213, slip op. at 8

---

**13.** "[T]he Supreme Court emphasized the fact that the bank "was a 'holder' of a 'secured claim' because the house retained a certain amount of value." *Id.* (citing *Nobelman*, 508 U.S. at 329, 113 S.Ct. at 2110).

**14.** "The portion of the bank's claim that exceeds $23,500 is an 'unsecured claim componen[t]' under 506(a)." *Id.*

**15.** "[T]he bank's contractual rights are contained in a unitary note that applies at once to the bank's overall claim, including both the secured and unsecured components." *Nobelman*, 508 U.S. at 331, 113 S.Ct. at 2111.

(Bankr.N.D.N.Y. Jan. 29, 1998).[16] In *Pond,* the debtors commenced an adversary proceeding seeking to void the lien of the third mortgagee. *Id.* at 2. Although the parties disputed whether the mortgagee held a secured claim, the court in *Pond* determined that an analysis under Code § 506(a) was unnecessary after *Nobelman* because the Supreme Court rejected the rule of the last antecedent of statutory construction. *Id.* at 6. As support for this conclusion, the court in *Pond* relied upon the statement of the Supreme Court that Congress chose to use the word "claim" instead of "secured claim" thereby intending to protect the lienholder's entire claim.[17] *Id.* Additionally, the court in *Pond* found that the rights of all mortgagees are protected by Code § 1322(b)(2) because the Supreme Court stated that these rights "were not necessarily limited by the valuation of its secured claim." *Id.* Therefore, the court in *Pond* reasoned that if a creditor holds a lien on the debtor's principal residence as its only security then it is entitled to the protection of Code § 1322(b)(2). *Id.*

Respectfully, the Court finds the analysis in *Pond* unpersuasive. The Court agrees that the rule of the last antecedent was rejected by the Supreme Court in *Nobelman;* however, it does not follow that the Supreme Court implicitly dismissed the necessity of an analysis under Code § 506(a). As noted by Bankruptcy Judge Alan H.W. Shiff in *Hornes,* "[t]he Court simply held that the word 'claim' in the other than clause [exception to modification clause] stands by itself, and is not implicitly modified by the word 'secured' appearing in the secured claims clause." 160 B.R. at 714. In other words, the Supreme Court in *Nobelman,* reasoned that this rule of statutory construction did not compel a determination that only the secured portion of a claim is protected from modification. However, *Nobelman* did not hold that the exception to modification clause applies to holders of claims that are completely unsecured. *See id.* After the discussion of this rule of statutory construction, the Supreme Court indicated that " § 1322(b)(2) cannot operate in combination with § 506(a) in the manner theorized by petitioners." *Id.* at 332, 113 S.Ct. at 2111. Additionally, the Supreme Court observed that "[p]etitioners were correct in looking to § 506(a) for a judicial valuation of the collateral to determine the status of the bank's secured claim." [18] *Id.* at 328, 113 S.Ct. at 2110. There is no point in *Nobelman* where the Supreme Court found that an analysis under Code § 506(a) conflicts with Code § 1322(b)(2). *See Hornes,* 160 B.R. at 713. Therefore, an analysis under Code § 506(a) is necessary for a determination of whether a creditor is entitled to the protection of Code § 1322(b)(2).

The Court finds that its previous rationale in *Scheuer* and the additional policy reasons relied upon in *Lam* support the conclusion that a holder of a security interest in the debtors' principal residence that is determined to have a completely unsecured claim is not entitled to the protection of Code § 1322(b)(2). The majority position interprets Code § 1322(b)(2) consistent with *Nobelman,* the intent of Congress, and public policy. The Court's decision in *Scheuer* clearly governs the ability of the debtors in the Cerminaro and Tinker cases to modify the claims of mortgagees if they hold completely unsecured claims.

■ The next issue to address is what date is relevant for valuing the residence of the debtor for the purpose of determining whether a creditor's claim is secured. In the Cerminaro case, Domestic argues that the Court should look to the date that it executed the loan with the Debtor, June 15, 1995, to value the Cerminaros' Residence. The Cerminaros assert that the date their Petition

---

**16.** Upon a review of its docket, the Court finds that this decision was appealed by the debtors to the U.S. District Court for the Northern District of New York. That appeal is presently pending. .

**17.** "It is also plausible, therefore, to read 'a claim secured only by a [homestead lien]' as referring to the lienholder's entire claim, including both the secured and unsecured components of the claim." *Nobelman,* 508 U.S. at 331, 113 S.Ct. at 2111.

**18.** As one court observed, this statement "is meaningless unless some portion of the claim must be secured under 506(a) analysis." *In re Williams,* 161 B.R. 27, 30 (Bankr.E.D.Ky.1993).

was filed is the applicable date.[19] The Court addressed the argument in *Scheuer* that the date to determine the value of a debtor's residence is the time when the mortgage was executed and concluded that "whether or not there was any equity in the Residence at the time the loan was made is irrelevant to the Court's determination of value as of the commencement of the case for purposes of determining whether [a creditor] ... holds a secured claim pursuant to Code § 506(a)." 213 B.R. at 419. Based upon *Nobelman*, the Court held in *Scheuer* that an analysis under Code § 506(a) is necessary before a lienholder is afforded the protection of Code § 1322(b)(2). *Id.* This Court has re-affirmed the holding of *Scheuer* and finds that it is applicable to the Cerminaro and Tinker cases. Therefore, the Court must determine whether Green Tree and Domestic held secured claims pursuant to Code § 506(a).[20] It is clear that the earliest date to value property for purposes of Code § 506(a) is the date of the Petition because that is when the bankruptcy estate is created. *See* 11 U.S.C. § 541(a). Courts presented with the argument that the mortgage date is relevant have determined that the petition date is the only relevant date. *See Norwest Financial Georgia, Inc. v. Thomas (In re Thomas )*, 177 B.R. 750, 752–53 (Bankr.S.D.Ga.1995) (holding that a creditor holding a wholly unsecured claim pursuant to Code § 506(a) is not entitled to the protection of Code § 1322(b)(2)). In the Tinker case, on the date the Tinkers filed their Petition, the balance due on their first mortgage was $29,437.03 and the value of their Residence was $28,000.[21] Therefore, there was no value in

the Residence to secure the claim of Green Tree under Code § 506(a).[22] *See id.* Similarly, in the Cerminaro case, it is undisputed that the first mortgage encumbered the entire value of their Residence on the date they filed their Petition. Therefore, Domestic does not hold a secured claim pursuant to Code § 506(a).

Based on the foregoing, it is

ORDERED that the objection to confirmation filed by Domestic to the chapter 13 plan of the Cerminaros to the extent it relies on Code § 1322(b)(2) is DENIED and it is further

ORDERED that the objection to confirmation filed by Green Tree to the chapter 13 plan of the Tinkers to the extent that it relies on Code § 1322(b)(2) is DENIED.

---

**19.** In the Tinker case, the attorney for the Tinkers argued at the evidentiary hearing, that whether there was equity when Green Tree executed its loan with the Tinkers is irrelevant.

**20.** (a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ....
11 U.S.C. § 506(a).

**21.** Based upon the appraisal of Robert Gerbin, the Court finds that the Tinkers' Residence had a market value of $28,000 as of the Petition date. Therefore, there was no equity for the mortgage of Green Tree to encumber.

**22.** In the Tinker case, Green Tree requested at the evidentiary hearing that to the extent *Scheuer* compelled its lien to be discharged or stricken, that any such order with respect to its mortgage be held by the Trustee until the Tinkers receive a discharge under their plan. The Court finds that it did not reach this issue in *Scheuer*. The only issue before the Court in this matter is the objection to confirmation filed by the creditors in both the Tinker and Cerminaro cases on the ground that debtors cannot modify their mortgages. Both of the plans of these debtors urges the respective creditors to agree to the satisfaction of the mortgage but do not request an order of discharge from the Court, discharging either mortgage.