**In re Kettly AUBAIN, Debtor.**

**Kettly Aubain, Plaintiff,**

v.

**LaSalle National Bank, Defendant.**

**Bankruptcy No. 897–82998–288.
Adversary No. 802–8091.**

United States Bankruptcy Court,
E.D. New York.

Aug. 1, 2003.

Roy Lester, Lester & Fontanetta, P.C., Garden City, NY, Counsel for Debtor.

Jeffrey Herzberg, Of Counsel, Adam E. Mikolay, P.C., Westbury, NY, Counsel for LaSalle National Bank.

MEMORANDUM OF DECISION AND ORDER GRANTING DEBTOR'S MOTION TO REINSTATE HER CHAPTER 13 CASE AND HER MOTION FOR SUMMARY JUDGMENT TO AVOID THE SECOND MORTGAGE LIEN HELD BY LASALLE NATIONAL BANK, AND SUA SPONTE ORDER GRANTING THE DEBTOR HER DISCHARGE

STAN BERNSTEIN, Bankruptcy Judge.

Issues:

■ The debtor has moved to reinstate her dismissed chapter 13 case [1] so that she may make a lump sum payment of $2,730, representing the delinquent final three monthly installments under her confirmed and later modified sixty-month chapter 13 plan. LaSalle National Bank (LaSalle), who claims to hold a second mortgage lien on the debtor's primary residence, has opposed the debtor's motion as a prohibited effort to extend the final payment under her modified plan beyond the maximum statutory limit of sixty months. The debtor replies that by paying the balance of the modified plan, she is doing nothing more than curing a default under that plan.

On the assumption that the debtor's motion to reinstate is granted and the debtor's closed adversary proceeding is necessarily also reinstated, the debtor has moved for summary judgment to "strip off" the second mortgage lien retroactive to the petition date. The basic premise to her complaint is that there was no collateral value to support any part of the second mortgage lien as of the petition date. The second mortgagee filed a cross-motion for summary judgment dismissing the complaint. Part of the cross-motion contends that the proper date of valuation is either the date that the debtor filed her complaint or the date on which this Court makes its determination of value. If either later date is used, both parties agree that as a result of market appreciation during the five years of the plan there is sufficient current fair market value in the collateral to support or cover, if not all, at least a very substantial portion of the accrued second mortgage debt, including costs and reasonable attorney's fees. Both parties have agreed to submit these related disputes for determination on their pleadings and memoranda of law.

---

1. The debtor argues that the Court may re-open this case under 11 U.S.C. § 350. However, since this Chapter 13 case was dismissed but not closed, the debtor's motion to reinstate is properly addressed under Fed. R.Bankr.P. 9023, 9024. *See In re Critical Care Support Services,* 236 B.R. 137 (E.D.N.Y. 1999).

## Background:[2]

### A. The History before LaSalle Filed its First Motion to Lift the Stay.

The debtor, Kettly Aubain, filed for chapter 13 relief under the Bankruptcy Code on April 24, 1997 (petition date). On her statement of affairs and schedules, the debtor describes herself as a 43 year-old woman, with two children, then aged 9 and 14, living with her in Freeport, NY; she also reports that she is the mother of a nine-month old infant who was then living in Haiti and for whose care she remitted $100 a month to Haiti as child support. The debtor works as a "hairstylist" at a beauty shop that she leases in Far Rockaway, NY; her job provides her a gross monthly income of $3,500. In addition, she reports that her "boyfriend" contributes $1,400 a month to assist her in meeting household expenses.

In connection with the filing of her chapter 13 petition, the debtor obtained an independent fee appraisal which valued her residence at $120,500 as of the petition date. She scheduled a first mortgage claim of $130,808.75 to The Green Point Savings Bank (GreenPoint), with an arrearage of $26,468.33. Her plan added "present value interest" at a rate of 9% per annum to the arrearage, and the chapter 13 trustee's 10% administrative surcharge on top of that. This entire gross amount would be paid in equal monthly installments over a term of 60 months. GreenPoint filed a proof of secured claim

on March 13, 1997, which stated that the entire first mortgage indebtedness was $123,343.27, including an arrearage as of the petition date of $26,035.18. In its proof of claim, GreenPoint informed the debtor and the trustee that the "present value interest," amortized at 10% over 60 months, on the arrearage would add another $7,155.06 for a total to be paid under the plan of $33,190.24. The debtor did not file an objection to GreenPoint's proof of claim; therefore, this proof of claim is deemed to have superseded the debtor's statement of the claim in its schedules and plan. The chapter 13 trustee apparently used the 10% rate for computing the present value interest.

The debtor also scheduled a second mortgage claim held ostensibly by Lee Servicing Company, with an estimated balance of $20,238.87 as of the petition date. The debtor scheduled the second mortgage claim as an "unsecured nonpriority claim" on her Schedule F. This second mortgage loan was originated by State–Wide Capital Corp. on February 23, 1995 for the principal amount of $20,000 at a contract rate of interest of 13.99 % per annum. On the date of the closing of the loan, the note and mortgage were assigned to Alliance Funding Co., a division of Superior Bank FSB. Some point later, the debtor was notified to send her first mortgage payments to Lee Servicing Company, P.O. Box 9598, Uniondale, N.Y. 11555–9598 (Lee Servicing).[3] That was the name and address

---

**2.** This Court has jurisdiction over this matter under 28 U.S.C. § 1334(b) and the General Reference to the Court under Rule 4 of the General Rules of the United States District Court for the Eastern District of New York. This is a core proceeding under 28 U.S.C. 157(b)(2). This Memorandum and Order constitutes Findings of Fact and Conclusions of Law under Fed.R.Civ.P. 52 as made applicable by Fed.R.Bankr.P. 7052.

**3.** On February 13, 2002, about 58 months after the debtor's plan was filed with this Court, LaSalle filed its initial motion to lift the automatic stay to which it attached an affidavit signed by Frieda Strauss, a "Bankruptcy Specialist of Superior Bank, FSB, the servicing agent of LaSalle." At no point in the affidavit is there any statement indicating the date or means by which LaSalle acquired any interest in the debtor's note and mortgage. Nor is there any statement in the affi-

used by the debtor on her list of creditors and on her schedules.[4]

The debtor also scheduled $17,823.29 in liquidated and undisputed general priority unsecured claims other than the unsecured claim held by Lee Servicing. Four of the unsecured claims were later allowed by virtue of the timely filing of proofs of unsecured claims; these allowed claims totaled $7,462.47. Because the second mortgage holder did not file a proof of unsecured claim by the statutory deadline, its entire unsecured claim would presumably have been discharged upon the completion of the plan as a matter of bankruptcy law.

As a condition to his recommending confirmation of a chapter 13 plan in which any debtor commits to pay less than 100% of the allowed unsecured claims, the trustee customarily demands that the proposed plan be amended to include a provision under which the debtor agrees to assign or pledge her annual federal and state income tax refunds to the trustee and the debtor further agrees to submit copies of federal and state returns to the trustee within thirty days after they are filed so that the trustee may monitor the status of any refunds. If there were any refunds, their turn-over to the trustee would result in a quicker completion of the plan. But if the refunds reflected a material and sustained increase in the debtor's disposable income, that increase would justify the trustee filing a discretionary motion under 11 U.S.C. § 1329(a) to modify the confirmed plan to reduce the term and/or to increase the percentage of the distribution to the holders of allowed unsecured claims. The debtor presented a plan that complied with this condition and thereby waived an opportunity to challenge the validity or fairness of the trustee's insistence that a pledge of tax refunds be included in the plan. After the trustee recommended confirmation, an order was entered on July 29, 1997 confirming the debtor's chapter 13 plan.

On July 5, 2001, less than thirty days shy of the fourth anniversary of the confirmation date, the trustee filed a motion to dismiss the case on the ground that the debtor had failed or refused to turn over her federal and state tax refunds to the trustee. The debtor's counsel broadly challenged the practice of including a pledge of income tax refunds as a matter of public policy, a practice that has been increasingly found to be improper in recently published opinions by bankruptcy judges in other districts. Unfortunately, in this case, that retroactive challenge to the provision was precluded not only by the doctrine of laches, but also by the doctrine of waiver.[5] To resolve this dis-

davit pointing to any provision in the servicing agreement that grants Superior Bank, FSB, a power of attorney to act on LaSalle's behalf in connection with any motion or other actions to be taken in any bankruptcy court that exercises jurisdiction over the second mortgaged premises. This point was specifically made in this Court's memorandum and order of July 17, 2002, and the second mortgagee's counsel has failed or refused to produce any record of any assignment of the note and mortgage. Indeed, the motion to lift the stay makes the false representation that the note and mortgage have always been owned by LaSalle, which is directly contrary to the provisions of the note and mortgage attached to Ms. Strauss' affidavit.

4. According to the affidavit of the agent for the secured creditor, the debtor was marginally in default of her second mortgage obligations as of the petition date by her failure to pay the prior two monthly installments of $266.21 each; nevertheless, the agent for the second mortgage asserted, without any supporting detailed accounting, that the total prepetition arrearage was $3,027.94; no explanation was given at all to account for the additional $2,650 in prepetition charges.

5. The Court did not accept the debtor's counsel's belated contention that the trustee improperly imposed the provision of pledging taxes upon debtors, and that it is too costly in an individual chapter 13 case to litigate this

pute, the debtor modified the terms of the confirmed plan by now committing herself to pay 100% of the timely filed proofs of unsecured claims, which required a step-up in monthly installments from $632 per month to $1047 per month for the final eight months of the plan.

On January 2, 2002, the trustee filed his eighth motion to dismiss this case due this time to the debtor's failure to make plan payments under the modified plan. On January 23, 2002, a conditional order was entered so that the debtor would have an opportunity to cure this post-confirmation arrearage in her plan payments.

B. The Procedural History of the Case after LaSalle Filed its Motion to Lift the Automatic Stay.

Just two months short of the fifth anniversary of the petition date, LaSalle appeared for the first time in this case, filing a motion for relief from the stay on February 15, 2002. The debtor filed an affirmation in opposition to LaSalle's motion and also filed an adversary proceeding, Case No. 02–8091 on the same day, March 19, 2002, for a retroactive determination that LaSalle's second mortgage lien should be stripped off, based upon the fairly recent decision of the Second Circuit in *In re Pond,* 252 F.3d 122 (2d Cir.2001). The *Pond* decision was the first time that the Second Circuit held that a junior mortgage lien could be stripped off if there was no collateral value to support the lien. *Pond* was decided forty-nine months after the petition date in this case.

The Court entered a memorandum and order denying LaSalle's motion to lift the stay without prejudice on July 17, 2002.

The Court also directed the debtor to file a memorandum of law within 20 days of the July 17, 2002 order on the issue of the retroactivity of *Pond.* In its memorandum and order, the Court also pointed out that LaSalle's counsel had failed to track the chain of assignments of the note and mortgage following the date of closing. The Court further ordered that an evidentiary hearing be held to determine the date and the value of LaSalle's second mortgage claim and, assuming that the debtor intended to maintain that *Pond* applied, as she did in her complaint, the Court would also hear arguments on whether *Pond* could be retroactively applied to the petition date or the date of confirmation.

Before a hearing on the issues of valuation and retroactivity could be heard, the trustee filed his ninth motion to dismiss the case on August 30, 2002, this time for failure of the debtor to make the final three monthly plan payments. The amount of the default was a mere $2,730.44, which included the trustee's 10% surcharge. It should be noted that as of the date of this latest default, the debtor had already fully paid the prepetition arrearage owed to GreenPoint. In comparative terms, this default represented less than 8% of the amounts the debtor had already paid over close to five years under her modified plan to the trustee. Over the fifty-seven months of the chapter 13 plan, the debtor paid $5,726.14 of the $7,462.47 in allowed unsecured claims, including the trustee's 10% surcharge, in addition to curing the $33,190.24 arrearage to GreenPoint (including present value interest). Thus, if the final payments had been timely made, this would have resulted in a 100% distri-

issue. The Court stated on the record that if the debtor's counsel were prepared to litigate this issue *ex ante* and not *ex post* confirmation, counsel could join several cases and he could invite other debtors' counsel to do the

same for a single hearing and briefing schedule so that the costs of litigation could be spread over a range of similarly situated cases.

bution to the allowed unsecured creditors, and by virtue of § 1328(a) of the Bankruptcy Code, the debtor would have received a full discharge of (i) the arrearage amount owed to GreenPoint and (ii) all prepetition unsecured claims, whether timely filed and allowed or not.[6]

Two weeks later, on September 13, 2002, GreenPoint filed its affidavit of the debtor's alleged non-compliance under what it asserted was an outstanding conditional order of dismissal. On September 19, 2002, a hearing was held on the trustee's previously filed motion to dismiss. For reasons that were not all apparent to the Court or to the trustee at the time of the scheduled return date, the debtor's counsel did not file a limited opposition to the motion, which would have presumably included a tender of the delinquent payments or a proposed conditional order of dismissal which would have given the debtor a very limited period of time to cure this default under the plan. Nor did the debtor appear for the hearing when she had appeared at the numerous prior hearings.

Under the circumstances, the trustee's motion was granted by default and on September 27, 2002 the Court entered an order dismissing the case, based solely upon the trustee's uncontested motion.

(The Court had no need to reach GreenPoint's motion because it had become moot upon the dismissal of the chapter 13 case.) Consequently, the adversary proceeding was closed by the Clerk's Office on October 11, 2002, because there was no underlying bankruptcy case to support jurisdiction over the adversary proceeding.

C. The Present Controversy.

On October 16, 2002, a mere five days after the clerk issued a notice of dismissal of this case, the debtor filed a motion to reinstate the case and to vacate the order of dismissal. By this point, the debtor had deposited the delinquent final payment of $2,730.44 in her counsel's escrow account, to be immediately remitted to the trustee if the case were reinstated. On October 22, 2002, the trustee, however, filed his affidavit in opposition to the debtor's motion to reinstate the chapter 13 case. The debtor filed a reply affidavit in opposition to the trustee's affidavit on October 28, 2002. On October 29, 2002, LaSalle filed an objection to the debtor's motion.[7] This Court's retrospective review of the extensive docket entries in this case shows a belabored and chronic history of defaults in plan payments to the trustee and in direct or current payments to the first mortgagee over the five years of the plan.[8]

---

**6.** According to the trustee's final report, the debtor paid 66.736% of the total allowed unsecured claims.

**7.** The trustee filed his final report on November 6, 2002.

**8.** On January 12, 1998, GreenPoint filed its first motion for relief from the stay. GreenPoint withdrew its motion on February 2, 1998. On March 30, 1998, the chapter 13 trustee filed his first motion to dismiss the case due to the debtor's failure to make payments under the confirmed plan. The trustee quickly withdrew his motion to dismiss a week later. On October 14, 1998, the trustee

filed a second motion to dismiss the case on the same grounds. That motion was also quickly withdrawn a week later. On January 12, 1999, the trustee filed his third motion to dismiss the case on the same grounds once again. That motion was also withdrawn a week later. On April 20, 1999, the trustee filed his fourth motion to dismiss the case on the same grounds. The Court authorized the entry of a conditional order of dismissal on April 29, 1999; none was submitted. The trustee filed his fifth motion to dismiss the case on August 6, 1999 on the same grounds. That motion was withdrawn within two weeks on August 19, 1999. On November 24, 1999, GreenPoint filed its second motion for relief

On December 12, 2002, the debtor filed a further affidavit in support of its motion to reinstate the case. In Paragraph 3 of her affidavit, the debtor explained that at the time the motion to dismiss her case was filed by the trustee, "I was suffering from severe abdominal pains and hypertension, so much so that on August 18, 2002, I was admitted to the Emergency Room of Long Island Jewish Center." She attached a copy of her "care instructions" as Exhibit A. She continued in Paragraph 4 of her affidavit to explain:

> For the next month I was back and forth to my doctor (see enclosed letter from Dr. Dalmacy attached as Exhibit B), trying to get my hypertension under control and to get my life back to normal. My mental state was of such that on September 19, 2002, the date of the hearing, I was not even aware of my problems with the Trustee. It was because of these reasons that I did not answer the motion. However I do have all the money and am attempting to complete my plan at this time.

Dr. Dalmacy's letter, dated October 15, 2002, succinctly stated: "Please be advised that Ms. Kettly Aubain is a patient of mine. She is currently being treated for severe complications of Diabetes Mellitus and Hypertension. Out records indicate that she has been disabled from February through September 2002."

During the course of several hearings and settlement conferences in chambers relating to these related disputes, the Court sought to narrow the issues for determination and in connection with this, it renewed its direction that the parties file memoranda of law on the open issues of law as identified in the Court's order of July 17, 2002. The debtor and LaSalle both obtained updated and current fair market appraisals of the value of the mortgaged premises. After the final round of settlement conferences broke down, the debtor filed a memorandum of law on March 17, 2003, to which LaSalle filed its opposing memorandum of law a week later. As noted above, the parties agreed to have this matter decided on the papers, and waived any evidentiary hearing on any of the earlier disputed facts.

There is one explicit set of findings of fact that this Court has decided should be made. The Court now finds that the debtor properly listed the junior secured creditor by identifying the mortgagee's servicing agent on her chapter 13 schedule and matrix of creditors. That was the only reliable basis that the debtor had for causing notice to be given to the second mortgagee. In an effort to allay the Court's concern that the second secured creditor may not have been properly served with a copy of the proposed plan, the debtor's counsel engaged in independent research and on May 12, 2003 submitted written evidence to the effect that Lee Servicing Co. was and remains itself a division or affiliate of Superior Bank, FSB. Counsel found this fact by resorting to an internet search under *www.mortgage.com*. Mr.

from the stay due to the debtor's failure to make the direct or current payments of debt service. GreenPoint withdrew this motion on January 20, 2000, less than sixty days later. On March 23, 2000, the trustee renewed his motion to dismiss the case for the sixth time on his now standard grounds. That motion was also withdrawn about three weeks later. On December 4, 2000, GreenPoint filed its third motion for relief from the stay. Green-Point's motion for relief from the stay was granted by order dated January 5, 2001, but that dispute was later resolved by the entry of an conditional order. The trustee filed his seventh motion to dismiss the case on his standard grounds on January 25, 2001. A conditional order was entered on February 27, 2001. On April 5, 2001, GreenPoint entered an affidavit of noncompliance that was withdrawn on May 23, 2001.

Herzberg, counsel for LaSalle, received a copy of this submission, but declined to reply to it; the Court may assume under the circumstances that Lee Servicing was as of the petition date an authorized agent of the second mortgagee, that as its agent it did, in fact, receive a copy of the proposed plan, and that the holder of the note and mortgage timely received or constructively received notice; therefore, no issue of due process remains.[9] One would have a difficult time conceiving of a more compelling instance in which the doctrine of laches should apply to preclude this Court from making a determination on the merits of granting LaSalle's motion to lift the stay.

Moreover, despite repeated directions from the Court, LaSalle has failed or refused to provide the Court with proof of the assignment from Superior Bank or with proof that it notified the debtor of this assignment. Thus, this Court is not satisfied that LaSalle held the mortgage at the time that it filed its motion to lift the automatic stay in February of 2002, nor is the Court satisfied, in light of the plaintiff named in the recent foreclosure action, EMC Mortgage Co., that LaSalle was the real party in interest as of the date that these disputes were submitted to the Court for determination on the pleadings. Nevertheless, the Court will proceed to discuss the issues raised in this case as if LaSalle was and at all times relevant to this case remains the real party in interest.

Discussion:

LaSalle's principal argument on the equity side is that the debtor had more than a reasonable opportunity to take the necessary affirmative action to avoid the second mortgage lien, and that she failed to do so until LaSalle filed its initial motion to lift the stay. LaSalle contends that it would be unfair to permit her to obtain that result at this very late date.

A. The Disposition of the Motion to Reinstate the Chapter 13 Case.

■ The debtor's counsel's main argument in support of reinstatement is based upon a plea for justice. The debtor struggled for five years to save her home from foreclosure by the first mortgagee and to pay unsecured creditors 100% of their allowed claims. Only after the debtor was a few months short of completing the full payment of the prepetition arrearage owed to GreenPoint—which she soon completed—did LaSalle filed its very belated motion to lift the stay. For want of a payment of less than $3,000, which the debtor's counsel has held on deposit in his client escrow account for the past nine months, it would be grossly unfair to deny the debtor this last opportunity to cure this modest monetary default in her modified plan. The debtor's counsel pleads with the Court that it recognize how severe a struggle it is for any chapter 13 debtor to complete the payment of a plan premised on curing a substantial prepetition arrearage on a first mortgage.

9. It would have been preferable for the debtor's counsel to have called the office of Lee Servicing directly to discover the name and address of the actual holder of the note and mortgage, and then to add that name and address to the matrix of creditors. Fed. R.Bankr.P. 1007 requires a list by name and address of each creditor; it does not further provide an exception for substituting the name and address of a mortgage servicing company. If this Court, however, applied this construction to the rule uniformly across the board, then it would also have to hold that no servicing agent, absent submitting a properly executed and notarized power of attorney, could file a motion to lift the automatic stay or for other relief in any case filed in this Court. That would be completely impractical.

■ Fed.R.Bankr.P. 9024 incorporates Fed.R.Civ.P. 60. Fed.R.Civ.P. 60(b) provides, in pertinent part, that

> on motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

A trial court has broad discretion to grant relief under Fed.R.Civ.P. 60(b)(6) in cases of extraordinary circumstances or extreme hardship. *See In re Emergency Beacon Corp.*, 666 F.2d 754, 760 (2d Cir.1981) ("A motion under Rule 60(b) is addressed to the sound discretion of the trial court and this discretion is especially broad under subdivision (6), because relief under it is to be granted when appropriate to accomplish justice."); *United States v. Cirami*, 563 F.2d 26, 32 (2d Cir.1977)(citing *Ackermann v. United States*, 340 U.S. 193, 71 S.Ct. 209, 95 L.Ed. 207 (1950), *United States v. Karahalias*, 205 F.2d 331, 333 (2d Cir.1953)).

Under the totality of the facts and circumstances of this case, the debtor moved fairly expeditiously—within three weeks of the date of the entry of the order of dismissal—to reinstate her case. As discussed above, the debtor satisfactorily explained that she was unable to remit the last three chapter 13 plan payments for the months of June, July and August of 2002 due to a flare-up of her chronic illnesses. In addition, the debtor made extraordinary efforts to comply with her obligations under her confirmed plan despite a severely limited personal income, chronic poor health, and the challenges of raising two teen-age children in the United States while supporting a third child in Haiti. It takes a very unusual case like this one to remind the Court forcefully and indelibly what an incredible personal sacrifice many a Long Island chapter 13 debtor has to endure to complete a five year plan to cure substantial prepetition arrearages on a first mortgage loan. There can be no disagreeing with the trustee that in this case he also had to spend an extraordinary number of hours over more than five years bringing motions to compel the debtor to perform her monetary obligations under the plan, for which he will never be adequately compensated. Nevertheless, the debtor still managed in the end to cure the entire arrearage owed to GreenPoint, which was her principal goal in filing for chapter 13 relief in the first instance. The dispositive legal and equitable consideration is that not only did the debtor virtually complete the plan, short of $2,730 in the final quarter of a 60 month plan, but she took prompt action as soon as her chronic medical condition allowed her to reach her counsel and within days of the administrative closure of this case in order to deposit the shortfall amount into her counsel's client escrow account. To deny the debtor an opportunity to reinstate her case under these very harrowing circumstances, so that she may gain the benefits of what she is legally entitled to as a successful chapter 13 debtor, would be a palpable injustice. Limited to these considerations, the debtor has fully satisfied

the requirements of Fed.R.Civ.P. 60(b)(6) as incorporated in Fed.R.Bankr.P. 9024.

■ The next issue to be determined is whether there is any merit to LaSalle's formal legal argument, separated completely from its tactical motivation, that according to *In re Jacobs,* 263 B.R. 39 (Bankr.N.D.N.Y.2001), the court may not grant a modification beyond the sixty-month term, and that reinstatement after sixty months have elapsed from the confirmation date would constitute such prohibited modification of the plan. LaSalle has failed to acknowledge that the *Jacobs* court rejected a motion to extend the plan to provide for additional payments and to distribute post-petition assets once the debtor completed the chapter 13 plan. *Jacobs* at 50. *Jacobs* is thus distinguishable from the instant case, in which the debtor is merely seeking to cure a default on payments that were already scheduled in the original plan. The creditor further cites *In re Javarone,* 181 B.R. 151 (Bankr. N.D.N.Y.1995) in support of its argument that the debtor is seeking an impermissible modification. However, the court in *Javarone* held that where the debtor's proposed plan extended beyond the sixty-month period, the court must reject the plan at the inception. Nevertheless, the court held that "the language of Code § 1322(c) does not prohibit them from maintaining payments beyond the term of the plan when Debtors utilize the cure provision of Code § 1322(b)(5)." *Javarone* at 154. Similarly, the debtor in this case is not seeking to extend the plan, but merely to cure a default on already-scheduled payments.[10]

The creditor also argues that it is inequitable to allow the debtor to "modify" the chapter 13 plan at this late juncture. The creditor cites *In re Taylor,* 208 B.R. 828 (Bankr.E.D.Pa.1997) in which the court rejected the debtor's proposed modification on the grounds that the plan was the result of protracted negotiations between the debtor and creditor on the eve of a foreclosure action. *Taylor* at 833. By contrast, in this case there were no negotiations between the debtor and second mortgage lien-holder; the lien-holder also took no action to protect its rights until the chapter 13 plan was nearly completed. Based upon this discussion of the relevant case law, the Court overrules LaSalle's objection on this ground. With the underlaying case reinstated, subject to an immediate transfer of the escrowed funds to the trustee, the Court will proceed to what it perceives as the substantive legal issue: retroactivity under *Pond* and the related equitable issues of laches or estoppel.

## B. A Retroactive Strip-off Order and Judgment.

■ As the debtor argues, if the debtor's dual request for relief is not granted, then LaSalle's mortgage will now be junior to a substantially reduced first mortgage balance as a result of more than five years of direct or current payments and the complete curing of the arrearage owed to the first mortgagee—the amount of the reduction in the senior indebtedness over the five years of the plan exceeds an estimated $60,000. On top of that, the fair market value of the mortgaged premises has substantially appreciated in the intervening five to six years. From the standpoint of the debtor, that would bestow an

---

10. The secured creditor has also cited *In re Moore,* 247 B.R. 677 (Bankr.W.D.Mich.2000) in support of its argument that the Court may not extend a chapter 13 plan beyond sixty months. However, the court in *Moore* held

only that according to 11 U.S.C. § 1329, a confirmed chapter 13 plan may not be modified to include additional creditors. *Moore* at 683.

extraordinary windfall upon a creditor whose claim as of the petition date was wholly uncollateralized, and who took absolutely no action to protect its interest until fifty-eight months after it received actual or constructive notice of the debtor's plan. Finally, from the debtor's perspective, the postpetition appreciation in fair market value in a chapter 13 debtor's primary residence is intended under the Bankruptcy Code to redound solely to the benefit of the debtor. Under no possible equitable disposition, should LaSalle benefit from the intervening reduction in the balance of the first mortgage and the substantial market appreciation in value.

LaSalle's principal argument on the equity side is that the debtor had more than a reasonable opportunity to take the necessary affirmative action to avoid the second mortgage lien, and that she failed to do so until LaSalle filed its initial motion to lift the stay. LaSalle contends that it would be unfair to permit her to obtain that result at this very late date.

11 U.S.C. § 1322(b)(2) bars a debtor from modifying the rights of a creditor who has a claim secured only by an interest in the debtor's principal residence. If a lien is partly secured by the debtor's principal residence, the debtor may not use 11 U.S.C. § 506(a) to "strip down" the lien. *Nobelman v. American Savings Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). The determination of whether a mortgage is secured is made by reference to 11 U.S.C. § 506(a); if there is any remaining collateral to support the mortgage, it may not be stripped down. *Id.*

If, however, there is no remaining collateral to support a second or junior mortgage, the anti-modification provision does not protect the lien from being avoided.

*In re Pond*, 252 F.3d 122, 126 (2d Cir. 2001). Although *Pond* was decided subsequent to the debtor's chapter 13 petition, the debtor's counsel is correct in pointing out that there was an important case precedent in this district, decided by this Court's colleague, the Honorable Dorothy T. Eisenberg, before the petition date of this case to the effect that a wholly unsecured second mortgage is not subject to 11 U.S.C. § 1322(b)(2). *In re Sette*, 164 B.R. 453 (Bankr.E.D.N.Y.1994). Other bankruptcy judges in the Second Circuit later followed Judge Eisenberg's lead. *See also In re Cerminaro*, 220 B.R. 518 (Bankr. N.D.N.Y.1998); *In re Scheuer*, 213 B.R. 415 (Bankr.N.D.N.Y.1997).

█ The parties have stipulated that as of the petition date, the LaSalle mortgage was wholly unsecured. However, LaSalle argues that the date of the adversary proceeding should be used for purposes of property valuation. The date to be used for purposes of a § 506(a) bifurcation depends upon the purposes of the bifurcation. "506(a) provides that a determination (or bifurcation) of secured/unsecured status must be made in light of the purposes of valuation of the property and of the proposed disposition or use of such property." *In re Soltan*, 234 B.R. 260, 276 (Bankr.E.D.N.Y.1999).

The purpose of the valuation at issue is to determine whether the debtor may avoid the second mortgage lien under 11 U.S.C. §§ 506(a) and (d). Courts have used several approaches to determine what valuation date applies in the context of a § 506(a) bifurcation.[11] For example, in *In re Crain*, 243 B.R. 75 (Bankr.C.D.Cal. 1999), the court held that the applicable valuation date for a § 506(d) bifurcation is the effective date of the plan. The court based its decision in part on 11 U.S.C.

---

11. See *In re Wood,* 190 B.R. 788 (Bankr. M.D.Pa.1996).

§ 1325(a)(5)(B), which requires secured creditors to receive the value of collateral as of the effective date of the plan as a prerequisite to confirmation of a chapter 13 plan.

However, § 506(a), which determines the secured or unsecured status of liens, does not refer to the effective date of the plan.[12] Moreover, "... the legislative history of 506 unequivocally indicates that subsection (a) is intended to accommodate a flexible approach to valuations, rather than a single, fixed method." *In re Johnson*, 165 B.R. 524 (S.D.Ga.1994).

In addition, while § 506(a) provides that value is to be determined in conjunction with any hearing, valuation hearings generally occur within a relatively short time after the petition is filed. However, the only appraisal of Ms. Aubain's property that is before the Court is the appraisal that is substantially contemporaneous with the petition. Even assuming *arguendo* that the plan confirmation date is the appropriate date to be used for valuation purposes, it is impossible to turn back the clock and value the property as of that date. LaSalle argues that the date of the adversary proceeding should be used as a valuation date. Despite the divergent views of the courts concerning valuation dates, no court has used a date later than the plan confirmation date for valuation purposes. *See In re Bernardes*, 267 B.R. 690 (Bankr.D.N.J.2001).

In addition, real property generally appreciates over time. *See In re Dinsmore*, 141 B.R. 499, 505–506 (Bankr.W.D.Mich. 1992); for purposes of determining whether a loan is subject to the anti-modification provision, 11 U.S.C. § 1322(b)(2), "looking to the date of filing is proper to discourage creditors from disclaiming security interests postpetition or attempting other tactics to defeat the debtor's ability to modify claims." The Third Circuit raised another concern in *In re McDonald*, 205 F.3d 606 (3d Cir.2000). Although the court did not address the issue of what date to apply because the parties agreed the loan was unsecured, it nonetheless stated, "whatever rule is adopted, it is desirable to avoid allowing an appeal to delay the date used for evaluation." [13] *Id.* at 615.

Therefore, since the valuation date depends first, on the purposes of the valuation, and second, on the equities involved, the flexible approach used by the court in *In re Wood*, 190 B.R. 788 (Bankr.M.D.Pa. 1996) is preferable. The court set forth various equitable factors to be used in determining what valuation date should apply. These include, *inter alia*, the debtor's contribution to postpetition changes in value; the parties expectations; the policy that those who bear the risk should generally benefit from an increase in value; discouraging windfalls; whether the party benefitting from the delay was the party primarily responsible for the delay; the inconsistency of using different valuation dates in the same proceeding. *Id.* at 794–96.

In this case, the increase in property value is attributable primarily to the appreciation in the residential real estate market. If the property is valued as of the date of the filing of the debtor's adversary proceeding, this will result in a windfall to LaSalle. Objectively it appears that

---

**12.** See 2 Keith M. Lundin, Chapter 13 Bankruptcy § 107.1 (3d ed.2002)

**13.** In *Pond* at 127, the court used the date of the hearing as the valuation date for purposes of 11 U.S.C. § 506(d) bifurcation, since the parties agreed that there was no collateral to support the junior mortgage lien; therefore, the determination of the appropriate valuation date for bifurcation was not raised nor discussed by the court.

LaSalle spent the better part of sixty months waiting in the wings. Conversely, if the property is valued as of the petition date, this will result in a windfall to the debtor.

There can be no dispute that the debtor had plenty of opportunities to bring a motion or complaint to strip off the second mortgage lien. Although from 1997 through 2001 this Court repeatedly expressed in open court during the miscellaneous chapter 13 calendar its substantial uncertainty as to what the Supreme Court intended in *Nobelman* concerning the effect of a wholly uncollateralized junior lien, this Court also repeatedly stated that it would hear and determine this particular issue if the debtor's counsel timely brought it back for determination in an adversary proceeding.

The Court could treat the delay of La-Salle in seeking relief from the stay in the fifty-eighth month of this case as subject to laches, and at the same time find that the debtor was also subject to laches on her part by not filing the adversary proceeding for a strip-off of the second mortgage lien until she had to oppose the motion to lift the stay. Under this "even-handed approach," based upon a theory of "offsetting penalties, down declined," the case would be reopened to permit the final payments to the holders of the allowed unsecured claims as a remedial measure of curing a default under the plan, and then the Court would enter the order of discharge, with the result that LaSalle would be precluded from enforcing any personal liability against the debtor. But that superficial kind of even-handedness ignores the intervening appreciation in market values, which neither party had any hand in bringing about. The Court would have to frame a unique and perhaps novel equitable resolution that deducted from LaSalle's secured claim the entire amount of the arrearage paid to GreenPoint and the entire amount of the principal reduction in the postpetition direct or current payments so that LaSalle did not profit from the reduction of the balance of the first mortgage as of the date that the trustee filed his final report. This would inevitably lead to a second chapter 13 filing in which the debtor would seek to cure the net arrearage of the second mortgage to the extent of the fair market value of her residence as of the second petition date, and to pay the current payments on the reinstated note to LaSalle. This would have the apparent advantage of redistributing part of the increased value to La-Salle and giving the debtor another five years to restructure the net balance of the second mortgage loan.

The Court, however, is reluctant to take this "creative approach" for several reasons. First, it would be a remedy for which there is no precedent. Second, the debtor's delay in bringing this matter for determination is understandable in light of the uncertainty in this jurisdiction concerning the applicability of *Nobelman* to unsecured loans, and in light of LaSalle's lengthy silence and failure to file a proof of claim. However, LaSalle has put forth no basis for its fifty-eight month delay in seeking to assert this lien. Therefore, the court finds that the appropriate date to be used for valuation of the property is the date of the chapter 13 petition.

This leaves the final question whether *Pond* can be applied retroactively to chapter 13 cases filed before *Pond* was decided. When *Pond* was decided, this chapter 13 case was still open and being administered by the trustee. This is enough of a wedge in time to apply *Pond* retroactively to the facts of this case—there is really no fact in dispute concerning the value as of the petition date; that has already been stipulated to or LaSalle's objection has been

waived by having this submitted on the briefs.

■ As a matter of federal jurisprudence, decisions on issues of federal civil law apply retroactively. *See Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993). "When a court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate the announcement of the rule." *Margo v. Weiss*, 213 F.3d 55 (2d Cir.2000). In view of this clear line of appellate authority, this Court finds no reason not to apply *Pond* retroactively to this case.

In the end, it should not matter that the debtor's counsel waited until LaSalle came forward in the fifty-eighth month of the case before bringing his adversary proceeding. Once LaSalle appeared in this Court, it is a fair conclusion of law and equity to rule that LaSalle opened itself up to any claims or causes of action to strip off the second mortgage lien that the debtor had as of the petition date. The policy rationale is that the extended concept of a fresh start, embodied in the strip-off doctrine under *Pond*, should be the predominant consideration, and as between the two parties, the most straightforward, least creative, and ultimately most principled approach is to deny LaSalle any benefit from an intervening appreciation in the market value of the debtor's residence. She did absolutely everything to receive the benefits of chapter 13 relief. She will pay 100% to her allowed unsecured creditors, she has saved her home from foreclosure by curing the arrearage on the first mortgage and making the direct payments to GreenPoint, and she is entitled to strip off the second mortgage lien as a function

of the settled construction of the relevant provisions of the Bankruptcy Code. The only thing that prevented this resolution more than a year ago was the last round of illness the debtor suffered during the last three months of her sixty month plan. Nevertheless, the debtor has completely convinced the Court that the order of dismissal was inequitable under the totality of the facts and circumstances of her chapter 13 struggle. This Court will not permit LaSalle to take advantage of that dismissal—the basis for the dismissal had absolutely nothing to do with LaSalle's rights and remedies under the Bankruptcy Code.

Since the parties have stipulated that the second mortgage was unsecured as of the petition date, the anti-modification provision does not apply and the second mortgage lien may be avoided under 11 U.S.C. § 506(d).

■ As an unsecured creditor, LaSalle waived its rights under 11 U.S.C. §§ 1325(a)(4) and 1325(b) by failing to file a proof of claim. Although subsection (a) of § 501 is permissive only, a proof of claim is a prerequisite to allowance of an unsecured claim in a chapter 13 case. *In re Francis*, 15 B.R. 998, 1003 (Bankr. E.D.N.Y.1981). Under Fed.R.Bankr.P. 3002, unsecured claims, whether listed by the debtor or not, must be filed within 90 days of the first date set for the § 341 meeting. It is undisputed that as of the time of the petition date, the claim of LaSalle was unsecured and that LaSalle failed to file a proof of claim within 90 days of the § 341 meeting.

For the foregoing reasons, the debtor's motion to reinstate her chapter 13 case for the limited purpose of curing the final payment default under the debtor's modified plan is GRANTED, and the debtor's motion in the reinstated adversary proceeding for summary judgment to avoid the second mortgage lien as fully unse-

cured retroactive to the petition date is GRANTED.

Both counsel are to be commended for their zealous representation of their clients. Indeed, both counsel were initially so convincing in their creative arguments that it took this Court considerable time to deliberate over this matter in order to reach a substantively correct decision and considerable time to draft and revise this opinion. Each party will, therefore, bear its own costs and attorneys fees. The Court has issued separate orders and judgments consistent with this Memorandum of Decision.